I'd like to reserve a couple minutes for rebuttal if necessary, Your Honor. Essentially, this case is, I think, unique in its facts and unique in the application of the prosecution of Mr. Hile. This is, in 28 years of criminal defense, I've never seen a case like this where an individual... Maybe if you stood between... Sorry. Your voice is not projecting, at least for me. I'm coming back off of a cold, I'm sorry. All right, thank you. Better? Do I get my time back on that? Just joking. Sorry. Okay. Better? I'll get closer. The case is unique in that I have not seen a prosecution like this against an individual for activities which are essentially in his own mind. There's nothing to indicate here that Mr. Hile did anything affirmatively to cause any emotional distress or any trauma to the particular victims in this case. I liken it to, I think we can all understand, back when the Beatles were huge here in this country, there were a lot of people who followed the Beatles around. They were fans, they were fanatics, and Yoko Ono came into the mix, and a lot of people blamed her for the breakdown of this particular group. And if you can imagine, there were hundreds and thousands of fans who just hated Yoko Ono. They probably, in their mind, thought about things they could do to Yoko Ono. They probably followed Lennon around. They followed the Beatles around with Yoko Ono. And essentially, they didn't do anything. But essentially, that's what happened in this particular case. Following somebody around is not a crime. Correct. He says he came from Michigan to California to kill her. Those are statements which have been attributed to him. However, the victims... He doesn't deny it, does he? It doesn't matter. It doesn't matter at this point. I think what's important is... He came not to get her autograph or anything else. He came... He came out to investigate. He said he wanted to kill a slut. He came out to investigate. He said a couple of things. One of the things he said was he came out to investigate who this person was, Tiffany Watkins, Brittany Cavalieri, Stephanie Botha. As the courts were, he was catfished by this individual in South Africa. And then he went to a Walmart and bought a knife or was trying to buy a knife and other things to carry out his plan. At the direction of his brother. Did he buy the knife? He did not buy the knife. His brother... He was in San Diego for about two days before his brother showed up. He had two days in which time to buy a knife. If he was going to buy a knife, like the research that he was doing at Walmart, he could have done so. Instead, he bought a cheap watch and some gum or something silly like that. But he never bought a knife. His brother, Brett Heil, shows up from Michigan and essentially to, quote-unquote, call his bluff. And then he's the one who takes him to Walmart. He's the one who has him looking around Walmart to buy a knife. Essentially, Mr. Heil never made contact with any of the victims in this case. The victims didn't even know Mr. Heil was there. He went to her house, didn't he? According to him, he went to her house, and that's it. He told his brother that he went to his house, but there's no independent evidence that Mr. Heil went to the house other than his own statements. Well, Mr. Heil would be the best guy to know whether he went to the house or not. If that was, in fact, her house. That's what he told these individuals. But I guess the crux of the argument is that these individuals, the victims in the case, were not put in any trauma until the police officer, without any investigation, other than what Mr. Heil told them and what Mr. Heil's brother told them, he called the victim and said, Oh, by the way, there's a guy that's here to kill you. You're on a hit list. Okay, so this is the part that I find the most troubling about this case, and I want the government to respond to this as well. So when, at the very moment when the police officer contacted the individuals who were being targeted, was Heil actually in their custody? Yes. So was there a threat to them at the very moment the police officer told the victims that they were victims and should go to safety or whatever he said to them? There's actually two parts to it. The first part was they were contacted and they were told to call. The initial contact. They left it on a voicemail. And by the time they called back, Mr. Heil was in their custody. Mr. Heil was detained. So when was the first call made? When Brett Heil contacted the police while they were looking for Mr. Heil when he lost him at Walmart. Okay, so at that moment, the message they left was just to call the police? Right. It wasn't you are being stalked? Right. Okay. And then the second time the defendant was in the custody of the police? Or at least in contact with the police.  Detained by the police. And making statements to the police. And at that moment, what did the officer say at that point? He made a list that there was an individual who had come out that he was on. They were on a hit list. Something to that effect. And that's, I guess, the issue. I mean, if they never knew that he was there to do anything. I mean, essentially, I guess you could say for the better part of a year, if we accept the prosecution, the government's theory, Mr. Heil would have been stalking her for the better part of the year by checking out all the emails and going on to her cell phone, the internet searches that he did. But he never did anything. The novel question for me, though, is more about whether he's guilty of causing them to be afraid or whether the intervention by the police officer at a time when he actually wasn't a threat because he was in custody. That, to me, seems to be the novel question in this case. And I think that the government's theory is but for his conduct, the police would have never been involved and the police would have never contacted him. I guess that's what they're saying is that the police intervened and because of that, that's what caused the emotional distress. So the standard for the intervention is reasonably foreseeable? I mean, I'm not quite sure what the legal standard is. That's their claim. I think the statute calls for the course of conduct which causes that particular trauma. And I don't believe the course of conduct can cause any trauma unless these people are aware of it. How does it matter how they become aware of it? It matters because I guess the cases indicate that you look at the course of conduct with the historical perspective. So if the individual is, like we see in the cases, texting these people, they have a relationship before, they know each other, claiming they're going to blow her head off, they're going to kill you, you're a slut, you're a whore, things like that, that individual knows that this person is capable of carrying out a threat. But the statute talked about a surreptitious investigation too, doesn't it? Pardon? The statute also contemplates a surreptitious investigation, doesn't it? To put under surveillance. Surveillance means like he's hiding so they wouldn't see him. Right, but that's using, I guess, Walker back to the historical perspective. You look at that individual. In other words, I'm sure that there are movie stars and politicians who have people who want to do them harm in their minds and are surveilling them and are following them around.  With an individual not knowing that this is happening, what trauma could that person have? So that's the point of the actual precedent defense in the case. Let me make sure I understand your argument. You're saying that if someone travels from one state to another to kill a movie star and puts that star under surveillance with the intention to kill, injure, or harass, and when the star finds out about it, that star has reasonable fear, that it's not a crime as you see it? Correct. If they had no knowledge of this individual in the first place. What do you mean in the first place? At what point do they have to have knowledge of it? Well, they have to have knowledge. In other words, the mere act of traveling is what we're talking about here. The mere act of traveling in a state to commit this particular crime and they're aware that this person traveled in a state, then they would have to have knowledge of that individual previously to have the actual act of traveling. I don't see anywhere in the statute or any case that puts that requirement here. But that's what happened in this case. The only thing he did was travel. There's nothing else that Mr. Howell did. He traveled with an intent to kill and then actually placed her under surveillance with that intent. And then these people found out about it and were scared to death, which I can't really blame them. So I completely agree with what Judge Silverman is saying, and I read that portion of the statute and thought this context does fit within Section 2261A2. But then I look at the indictment and he was charged with 2261A1. And A1 doesn't have that place under surveillance. It plays under surveillance with conduct that would be reasonably expected to cause substantial emotional distress. So I don't know why I thought that this was more B2, but as I'm looking at B1, I can see maybe the government can explain how it fits under B1. The A1 section has the travel. As a result of such travel, the intended victim was placed in reasonable fear of harm or serious bodily injury. Right. So A1 requires the travel, and 2 is just placing under surveillance because I agree that he placed under surveillance. The indictment charges that it uses the place under surveillance language, doesn't it? But not the indictment under which he was. I don't know. I'm looking at the indictment. It says the defendant did travel in interstate commerce with the intent to kill, injure, and place under surveillance with intent to kill, injure. Right, and harass. Right. And as a result of such travel, then they suffered the reasonable fear of harm. And that's, once again, the brunt of the argument is that as a result of the travel, if the individual didn't know who this person was and what the capability was of this person carrying out any threat they have, would they have suffered any injury or any harm? In this particular case, the harm that was suffered was a result of the police without investigating. I mean, this could be, let's put it in a different perspective. Mr. Heil was, and they didn't know at this point, if he's bipolar, if he's schizophrenic, if he's just a rambling lunatic making claims that just don't make any sense at all, they would at least have a somewhat duty to investigate the veracity of the statements or whether or not he was capable of carrying out these things before calling the victims and saying, hey, there's a guy that came across state lines to kill you. And I think that's pretty important. I'd like to ask a question about our standard of review here. In your brief, you characterize the district court's denial of a suppression motion as an evidently ruling subject to review for abuse of discretion. But usually we review denial of a suppression motion de novo. And you didn't object to the district court's instruction on intent at trial. Assuming we review for plain error, how could you establish that it was clear or obvious at the time the district court ruled that a purpose rather than knowledge, the knowledge intent standard, was required in this case? I think, and Your Honor, I'm running out of time. You have time to answer. Okay. The intent was implied by the statute and the way it was written. In other words, it was our impression that how could he have committed the conduct without having an intent requirement. And that's, I guess, the way we analyzed it for the brief. Let me see if there are any other questions. There was one other thing that bothered me about this case was the presence of the police officer when he was at the county mental health department being interviewed. Assuming that was error, why would that just be harmless error under our standard review? Well, Your Honor, that goes back to this particular case. I mean, this officer, Officer McDaniel, is an experienced San Diego police officer and basically saw an opportunity to extract information from Mr. Heil. He didn't have to be there during the CMH evaluation. All he has to do is take them there and let them go ahead and do the processing, which takes them as long as it takes, but it doesn't take the police officer an hour. He doesn't have to sit there for an hour and follow him around to listen to whatever statements he's making. And, once again, why did you come here is not a statement that CMH is actually particularly interested in hearing. That's a statement that was applied by Officer McDaniel to CMH, at least our impression was, because that's the type of activity that they engage in. Police officers in that particular jurisdiction, we know, essentially will ask questions, again, incriminating statements, and they'll deal with it later. I mean, they know what will happen with the trial courts, and they know the impact that's going to happen. Right, but one of their obligations is to protect the public, and they clearly thought that he was a threat to members of the public. I mean, you did say that's what he came here for. And, for that reason, that doesn't relieve them of the obligation to follow the law, and, in this case, he wasn't doing that. I'm unclear. The officer asked him questions at the police station, right? Right. Those were excluded by the judge. Right. Then he goes to the mental health place. Who questioned him at the mental health place? The mental health screening people. Not the officer. But the officer was there with them for the hour. Well, there may have been a lot of people there, but, I mean, the people asking questions were the mental health people. Correct. Are they entitled to ask him questions? Mental health people? Yes. Okay. Then what is the basis to exclude those questions asked by the mental health people about whether this guy ought to be committed or not? Well, it was our argument that if you look at the combination of circumstances, you have an emotionally disturbed person detained against his will. I mean, he doesn't want to be committed to the mental health facility, and the police officer is there with them, and there's really no reason why this police officer would be there for an hour. I can think of a reason. The guy is they think he's homicidal, and they want to protect the hospital staff. And that's why they have hospital staff there. That's why they have restraints. Well, there may be other ways to protect it, but, you see, you can't think of a reason why he'd be there. One reason is to make sure the guy doesn't assault the doctors and the nurses. I understand, Your Honor. Okay. So getting back to my question, if they have the right to ask him questions about whether or not they should have a 72-hour hold, I'm not sure what the problem is other than, if I understand it, your sole argument hinges on the fact that the cop was in there while this was going on. Correct, Your Honor. That's it. That's the alpha and omega of the whole thing. Yes, Your Honor. Okay. Any other questions? Okay. Thank you. Good morning. Good morning, Your Honors. May it please the Court, Colin McDonald for the United States. Your Honors, this case is not all about what was merely in the defendant's head. The defendant had a documented plan to kill the victims in this case. He traveled from Michigan out to San Diego on a Greyhound bus. He had a list of things that he would need in order to carry out his intent. Zip ties, duct tape, chloroform, knife. And he then traveled. He came to San Diego and was found, in fact, with zip ties and duct tape in his backpack. He also told his brother, we don't need to buy a knife. We don't need to buy a knife because we can just get one from the victim's house. We can get one from her house. We don't need to buy a knife. He told his brother, I'm here and I want to cut the victim's throats and watch them die slowly. Okay, so I realize all those facts are in there, but what I'm really interested in is the legal question about causation because the statute says that in the course of or as a result of such travel or presence engages in conduct that places. Now, is this a case of first impression where he has not personally, I want to say directly, made contact with the targets of his surveillance? And we have the people who made contact who caused the victims to be in reasonable fear of their death or serious bodily injury was the police officer. So what is the standard that we should apply here? And is this a case of first impression that we need to articulate a standard that we should say, but for causation, proximate causation, reasonably foreseeable that? Yes, Your Honor. Well, it is a matter of first impression for this court in terms of what placing in reasonable fear or causing substantial emotional distress means. There are cases, however, where there has not been direct interaction between the defendant and the victim. And for that proposition, I would like to direct the court to United States v. Wills. This was originally cited in the appellant's opening brief. This is from the Fourth Circuit, Wills, W-I-L-L-S. And what happened in that case is the defendant was, he had robbed a home, and the homeowner came into the house at 2 a.m. and found him, and the robber ran off. Well, at the preliminary hearing for that robbery, the victim of the bank robbery observed and identified the robber in court. The defendant then came up with this plan to keep the witness from testifying against him. So what he did is he traveled from Washington, D.C. to Virginia, and he put a fake job posting on the victim's house and said, hey, we have a job available, $11 an hour, call me at this number. But he didn't, the victim didn't know, he didn't know that it was the defendant, he didn't know that it was the fellow who had robbed his home. The defendant then went again the next day, traveled from D.C. to Virginia, and placed a second note and said, hey, we still have a job, call me about the job. So the victim called the defendant, not knowing that it was the home robber, called him and set up an interview with the defendant's secretary. The victim then traveled from Virginia to D.C. where he met the defendant's secretary at Union Station, and the government proceeded on the theory that the secretary then took the victim and met with an accomplice where they then finished the deed. And I think even to this day the body has not been found of that witness victim. So in that case there was no, on the record, there was no direct interaction between the defendant who engaged in the travel, and what was the interstate travel there? It was from D.C. to Virginia to place the fake job postings on the door of the victim. So the victim never knew that the defendant had traveled. He didn't even know, necessarily under the facts of the case, he didn't even know that it was him who was ultimately going to carry out his death, his execution. Well, counsel, then what should we make of the fact that in 2013, after Heil's conduct, it amended the statute to include the language engages in conduct. What would be the purpose of that? You know, Congress did amend it, and I looked. I searched through legislative history to try to find a rationale for why that came to be, and I can't draw any good conclusions about that change. Certainly they did change. Should we give that any weight in our consideration of Heil's case? Not insofar as the statute that was operative at the time of the conduct did not include that language. But there is conduct that the defendant engaged in that led to placing the victim in reasonable fear. He came to San Diego, and while he was here he went to the victim's house. He then told his brother that he was here to kill them. That act created sort of a chaotic scene. Suddenly the defendant here was away from the Wal-Mart. We know that they met at this Wal-Mart. The brothers were at the Wal-Mart. Suddenly the defendant vanished from the Wal-Mart, and his brother couldn't find him. He couldn't find him, and immediately preceding two hours or so, the defendant had told the brother that I'm here to kill these two people. So that created a chaotic scene, and the brother called the victims. He had their number because he had the defendant's notebook. He tried to get in touch with the victims. He called the girl, but she didn't answer. She then later called him back. So there was an attempt by the brother to reach out to the victims. Again, that's not him. So, I mean, it gets back to that proximate, you know, Judge Nelson's question and my question, the legal standard. You just said you're relying on wills for this, United States v. Wills, but you don't even cite it in your brief. That's correct. It was not cited in our brief. But you're relying on it today? Do you have a cite for it? I guess it's in the appellant's brief. The appellant says he cites it at page 37, but it's not on page 37, so I don't know where it is. Yeah, it does appear in the appellant's opening brief in several places, Your Honor. It says 37, 52, and 53, but I couldn't find it. Yes, it is in there. One cite is on page 56. So they're relying on it, but you say it supports your position, and it's the only case that's addressed this question before? It's the case that directly addresses some of the questions that are in this case, where can the police be the cause of the reasonable fear? Can it be someone other than the defendant? Well, I mean, what if you have police who are just reckless, and they've got the person who's there jailed in a mental treatment facility, and they're not required to contact the victim because they don't come under the California case that requires them to do so, and they act recklessly and create the conduct and the fear in the victims. Where's the line that you would draw there? Do you know what I'm saying? Yes, I agree that the line in terms of where we draw it with this statute, it's hard to draw. And there could be scenarios where the fear is much less reasonable because of some third party in the middle, and the substantial emotional distress just isn't there because of intervening acts. And I entirely agree with that. But here, the causation is very close. There was an unraveling scene where the defendant had disappeared from the Walmart and was pretty close to the victim's house. The brother called the police and said, My brother just told me that he was going to kill these victims. The police have to act on that threat, and to think that the defendant would not be liable because the police then acted on it. And Your Honor, to your question as to whether he was in custody when the police first reached out to him, this was Deputy Winton with the Santee Sheriff. He went to their house. While his whereabouts were unknown, the defendant's whereabouts were unknown, he then waited around for about ten minutes or so, and then put the note on the door and said, Call me back about Brian Heil. So at that point, the defendant was not in custody. So it was an unraveling set of circumstances, certainly with potential grave results, and the police were acting in the heat of the moment to protect the victims. And that's exactly, that's precisely what this statute allowed them to do. In fact, the congressional record, there's language that says the author of the bill, and this was also cited in the reply brief, where the author of the original bill said, We need a statute. I've talked to women who have said that police have told them, We can't act until you've been harmed. We can't act until you've been harmed. And so that's why these stalking bills are necessary. That was in the legislative history. We need to be able to act when we know the threat is imminent. And the threat here was imminent. So it should not matter. Let's say that the defendant traveled out here, went to their house, and then a neighbor saw him. Let's say a neighbor saw him, and he told the neighbor, I'm going to kill these victims. And then let's say the neighbor passed on that threat. I don't think there would be any question that it was the defendant's conduct that caused the reasonable fear or the substantial emotional distress if the neighbor then ran over to the victim's house and said, There's this guy that's here from Michigan, and he wants to kill you. It was that defendant's conduct, and that hypo I just posed, that clearly would have caused the reasonable fear and substantial emotional distress. It should not matter that it was the police who communicated that threat. In fact, the threat is even worse, I would say, under this set of circumstances. There could be reckless police, but there were not reckless police here. And the threat here was even worse because it was a real threat. When the police tell you that there's a threat, that means something. That's pretty scary. May I change topics for a second? Let me ask you about the statements made at the county mental health place. Do I understand correctly that Hyle had already been arrested before he was transported to county mental health? He was arrested for purposes of Miranda in the sense that the statements that he made to the Elkhorn police officer needed to be Mirandized before he gave them. So in that sense, he was under arrest, but he was not under arrest for any pending charge or anything of that sort. I'm not sure I understand your distinction. He was placed under arrest by the police. He was not free to go. Isn't that right? Yes, he was not free to go, though part of the intake process for the mental health 5150 statute is you actually inform the defendant, I suppose, that he's not under arrest. You're getting ahead of my story. He's at the police station. He was placed under arrest by Officer McDaniel, right? Yes. No dispute about that. No. While under arrest, he's transported in handcuffs to the county mental health place. Yes. He's then interrogated at county mental health. No. They didn't ask him any questions there? At county mental health, the police officer did not ask any questions. I didn't say the police officer. I said he was interrogated. He was questioned there. Yes, he was questioned by the admitting physician or psychiatrist there. After he had already been arrested. Yes. Now, why doesn't that pose a Miranda problem? Because there was no government action. It was not custodial interrogation in the Miranda sense. Except that the arresting police officer is there in the room. Well, that's true, but the doctor did not act at the behest of the government. How did the guy get there? How did Heil get to the doctor's office? The police officer, as part of the process for admitting mentally injured— That's correct. Now, why isn't that a Miranda problem? Because there must be some sort of government—custodial interrogation. And the government here, the law enforcement involved, did not interrogate the defendant at that point. He was brought in for an analysis by the psychiatrist. And as part of the questions that he was asking to test the mental stability of the defendant, he asked him, why did you come see me? So why is the officer in there? For protection, for one thing. What evidence is there of that? Well, the—and we cited this—the statute, the 5150 statute, talks about the officer and the need to be there until the point at which— I think it talks about the transportation, but not that the officer should take him. But to Judge Zimmerman's point, the county—the person who interrogated him did work for the county. It was a state actor interrogating him. Why does it make a difference whether it was the enforcement branch or another branch? Because there has to be a preexisting agreement between entities. That's the case law, preexisting agreement, in order for there to be a Miranda problem. And there's no preexisting agreement in terms of soliciting any information from defendants from the county mental health facility. They're just there to ensure— Let me ask you just again, hypothetically, suppose we were to disagree with you and find this was sort of the second half of custodial interrogation. Would we be on the right track to say this would have been harmless because he made similar statements to his brother, and those statements are indisputably admissible? May I answer, Your Honor? Sure. That is exactly correct, Your Honor. The substance of that statement, which was to kill a slut, he was here to kill them. That was precisely the statement that he had told his brother. He said that he was here to kill them, Tiffany and her boyfriend, and watch them die slowly. He told him that, and the remainder of his intent was clear. His intent was clear. The question is, and the notebook also clearly indicated his intent. In other words, even if the statement to the doctors, even if those statements are out, he said the same thing to his brother, and that would have come in. That's correct, and that would have come in, yes, Your Honor. Why couldn't the officer be placed outside the door if we're talking about protection here? Evidently, as I was reading in Bruce, this is a typical practice of California police officers to be in the room. Is that correct? I can't speak to every situation with these police officers in the room. I can't speak directly to that. Well, you've indicated this is a case of first impression. If we were to write an opinion, should we deal with that issue of where the police officer ought to be? No, Your Honor. No, Your Honor. Because? Because, for one, it's harmless error based on the multitude of evidence that shows the defendant's intent. So that specific question, his statement goes to his intent. What if we had no other evidence? If there was no other evidence, then we would probably have to dig into a deep analysis of whether that statement was properly admitted. But here, based on his notebook, the computer hacking that he engaged in to hack into their e-mails, get their contact list, their addresses, then come out here and tell his brother that he was here to kill them, and that if he had not intercepted him that day, he would have carried out his plan. He told his brother that. He would have carried out his plan. And so we do not need to reach that question. I agree it's uncertain. So under standard of review, harmless error is your response. Is that correct? Assuming that it was inappropriate for the officer to be in the room. That's correct. All right. Thank you, Your Honor. Thank you. Mr. Carlos, back to you. How much time does Mr. Carlos have? You're over. We'll give you two minutes. I just wanted to just follow up, Your Honor. And once again, I believe this to be a unique case and a case of first impression for the Court. And essentially what we're doing is we're punishing an individual for his thoughts and not giving him the ability to have any free will. And in this case, Mr. Heil was here for two days and didn't do anything, didn't make any contact, didn't make any threats. There was nothing directed at these individuals. All the cases cited in both briefs have contact with the individuals prior to the travel, which I think is the most important part. These individuals and the other cases harassed them, threatened to kill them. The individuals knew that these people were doing this. In this particular case, Mr. Heil wanted to find out what was going on, what happened in his life that caused him to become in contact with this person in South Africa, this person in San Diego. But there's no indication that he had any contact or any attempt. He didn't threaten to kill her. He didn't threaten to kill her boyfriend. He didn't do anything other than travel here and do some type of investigation, and that's it. And go by the house, right? He went by the house. But according to, I guess, that's not enough. The victims did not know that they drove by the house. In fact, I know the court's aware of this, the victim, Tiffany, TW in this case, had threats from other people. She was already fragile to start with. Her nude photos, her family photos, her family contacts were all over the Internet. To this day, they're still out there. So what? What does that have to do with it? When the police tell her that there's somebody here to kill you, that causes her the trauma because of course she's going to be afraid. Of course she's going to be hurt and in fear. But in this case, Mr. Heil was not one of those people who called. Mr. Heil. So you're saying he reached the brink of committing an action that would cause that he needs to be allowed to change his mind and not act on it? Yes. Otherwise, this would be some type of... Just the travel is enough. The travel with intent. Back to my Yoko Ono thing. People following the Beatles around, wanting to do harm to her but never doing it. With her not knowing about it, where's the crime? And I think that's where we're at in this particular case. Very interesting.  Thank you, gentlemen. The case just argued is submitted. Good morning.
judges: Nelson, Silverman, Wardlaw